Good morning, Your Honors. May it please the Court. My name is Narendra Shiganti. I represent the Appellant Insight, and also I'm one of the appellants on an issue relating to sanctions imposed on me by the District Court. Your Honor, this being a decision coming out of a summary judgment motion as well as a Rule 12b-6 motion on the merits of the case, the standard of review is de novo. And there are a couple of issues that I brought into the appeal, which one is a discovery issue and one is a sanctions issue, and on those issues the standard of review is abuse of discretion. And there is a further issue about whether the District Court had the jurisdiction to revisit the portions of the case that were dismissed on which the District Court declined to exercise pendent jurisdiction but later recaptured the pendent jurisdiction after a notice of appeal was filed. And that was also briefed in my opening brief as to as a part, second part of the brief. I will address the antitrust issues because they are the principal issues in this case. Are you suggesting that a timely Rule 59 motion is made and you just happen to flip in your notice of appeal? The District Court can't resolve that timely Rule 59 motion? Your Honor, the procedure on that issue — I'm just asking, is that what you're saying? That is what I'm saying. Well, if it is a — if a notice of appeal is filed, then there is a procedure, a set procedure that was given under Gould within the Ninth Circuit and the procedure was not followed. That is my issue. Thank you. Principally, Your Honor, the issue is whether a small company was driven out of business by a very large competitor. Insight was in the business of providing implementation software services in a niche market identified as ERP implementation for manufacturing automation software for PeopleSoft software. Mr. Chiganti? Yes, sir. Is Judge Gould with a question? I couldn't quite follow whether there was specific evidence presented that implementation of the PeopleSoft software would itself be a relevant market. I saw in your brief where you said something like the district court impliedly, you know, impliedly agreed with you. But in the district court opinion, I didn't really see whether the district court said that that is the relevant market. Yes, Your Honor. There is an abundance of evidence in the entire record which shows, first of all, the ecosystems, the software implementation services ecosystems are distinct and separate for each ERP software vendor. For example, at the time the case was going on, there was Oracle, Microsoft, SAP, and other companies that were PeopleSoft. They all had their own software suites. And if you specialize in implementing one particular software vendor's software in a particular vertical market, that skill is not itself transferable to other vendors. I can understand maybe that skill isn't transferable, but does that resolve whether there's a relevant product market just in the single software's implementation? Yes, Your Honor. Go ahead. Is there a case that says that? Well, Kodak is a case that talks about derivative aftermarkets, for example. Kodak is about talking about providing services on Kodak brand copiers, in which if we look at Kodak dissent by Justice Scalia, Justice Scalia mentions that this decision implies that there is an intra-brand services aftermarket that is a distinct and separate market. In fact, the industry standard is our own expert has identified, and we presented the expert report on this thing that indicates that the very existence of plaintiff, for example, Insight, it was a market participant in that niche market alone. Insight did not have the skill, for example, to implement a SAP or Oracle or Siebel or Microsoft. They had this PeopleSoft implementation services market, and that is where they had 100-plus consultants, and there were more than 90 similar players within that niche market, which we identified. We called it the ecosystem throughout the brief. And there are these independent software, these services ecosystems that coexisted. It's kind of like an umbrella. You are a software vendor, for example, Microsoft. You've got only Microsoft-certified service providers ecosystem. They don't know how to implement Unix, for example. Their operating systems are different, and therefore people who are competent in programming in Unix environment may not know how to program in Windows environment. So that is how the market is quite differentiated. And the specific evidence is presented both from the evidence in the form of deposition of the CEO of PeopleSoft, Mr. Craig Conway, and also from the evidence from our expert and our own witness, Don Green. As a matter of fact, the two customers clearly sought the bids only from PeopleSoft implementers. For example, Interstate Batteries first selected PeopleSoft for its functionality because PeopleSoft was determined to be the key. They had the modules, for example, software modules, the framework that can implement the distribution software, and therefore they selected PeopleSoft, and then they asked for PeopleSoft implementers to bid on the software implementation part of it. So clearly there is that separate market identified within the evidence. Thank you. I didn't want to use up your whole argument with answering my question. No problem, Your Honor. Thank you. There is one additional issue, Your Honors, that I briefed in this matter, is the dismissal of the Section 2 claims, monopolization and attempt to monopolization, which the district court ruled based on the pleading alone. The complaint was sufficiently alleged. As well as if we take the evidence that was developed throughout the case later on, it was clear that PeopleSoft had a tremendous amount of market power as the controller of this entire ecosystem that developed under PeopleSoft. That is number one. Number two, PeopleSoft CEO, Mr. Conway, testified that it was in their interest to develop these people because they allow the software vendor to penetrate all kinds of markets. There is Coca-Cola bottling company, IMI, which provides spare parts for dispensers of Coca-Cola fountain drinks, and that is a niche market into which they wanted to expand into. There is a shoes market. There is an apparel market. There is a health care market, education market. Each of these various markets, in order to penetrate, the one software vendor did not have the ability to penetrate, so they developed independent software implementation vendors to go out and market their software in those niche markets. That is clear, and it is also clear that the customers select the product for its functionality, and therefore the uniqueness of the product is a factor in this evaluating whether they had the market power. And the fact that PeopleSoft decertified and eliminated 70% of the ecosystem players, small ones, and they kept all the IBM and Pricewaterhouse, Arthur Anderson Consulting, the big five consulting companies, they kept them in the ecosystem, but they eliminated all the 70% of the smaller players, including Insight, and they claimed that they didn't have the market power. Market power, I submit to the court, as I explained in the brief, is to be seen whether somebody could and, in fact, did exercise the idea of excluding rivals on the basis of other than pure competition. And here there is an abundance of evidence, at least for the purpose of summary judgment, to show that there is enough market power in PeopleSoft to do all the actions that it was complained of. And there's five minutes. I deserve the rest of the time for rebuttal, Your Honors. All right. Thank you. Thank you. Good morning. May it please the court, my name is James Hughes. I'm representing Oracle USA, Inc., which is the successor to PeopleSoft. PeopleSoft hasn't existed for four years because it was acquired by Oracle. Insight's case failed below for two reasons. First, in many cases the claims that it made were contrary to law. And second, and more significant, in all the cases, in all of its claims, there was at least one element on which it had the burden of proof and as to which it had no evidence in its favor. Now, there's 14 causes of action, and I obviously don't have time to review each of them, so I'll try and do the highlights of what happened before, happened below. On appeal in several, in a number of places in its brief, Insight attempts to reverse the burden that was imposed below, arguing that PeopleSoft, for example, didn't prove what its costs were or didn't submit evidence in certain areas. And I would just like to emphasize that once PeopleSoft came forward and showed that Insight had no evidence, it wasn't PeopleSoft's burden to prove the negative. It was Insight's burden to come forward with evidence. Let me go to the specific claims that we have here. And the first is the section, Sherman Act Section 2, monopolization claim and attempt to monopolize, which was dismissed on a 12b6 motion, the third 12b6 motion directed toward that claim. Insight has not, in any of its briefs or this morning, made any attempt to explain why the Twombly case decided by the Supreme Court after Judge Chesney granted the motion to dismiss in this case isn't directly on point here. The Supreme Court made absolutely clear in Twombly that a plaintiff has to plead facts, not just parrot the language of the statute. And that's what Insight failed to do in its monopolization claim as to a particular element that was necessary, and that is the element of monopoly power. It alleged nothing in its complaint. Counsel. Yes, Judge Gold. Judge Gold, could you address at some point the question I posed to your adversary, namely what is the relevant product market here and what's the state of the evidence in the record on that and whether the district court made any factual finding on that? Because as to the monopolization, if it was dismissed, there wouldn't be evidence. So it would be more a question of what did they plead about the relevant market. Let me try, Judge Gold. I'll answer the last part of your question first, and that is that the district court did not make a finding on that for the reason that you just stated, I believe. But in the complaint, so what the district court did was since it was a motion to dismiss, it would assume that the allegations of the complaint were accurate with respect to the monopolization claim. The allegation of the complaint was that the market in question was the market for implementation of PeopleSoft supply chain management software, an enterprise resource planning product. But there were no allegations in the complaint demonstrating that PeopleSoft had power in that market. And although you're right, at that stage there was no evidence, the fact is evidence did come in over the course of the case, which showed that plaintiffs never could have met that burden. And that evidence was the only evidence in the record as to market shares in that particular market was the testimony of Craig Conway, the CEO of PeopleSoft, who said that PeopleSoft's share of the implementation market was approximately 5%, certainly always under 10% during the relevant period. And there's that fact. And that at all times, even Insight has to admit, there were at least 34 certified implementation partners who could provide services in that market, including many stable, big, powerful firms. The record shows that Deloitte, IBM Global Services, Capgemini, PricewaterhouseCoopers, Computer Securities Corporation, KPMG Consulting, and Accenture, which wasn't a certified partner, was, Mr. Conway pointed out, the second largest PeopleSoft implementation partner of all. So there was always vigorous competition in this implementation market. Now, yes, the district court didn't reach that because all it had to consider on the motion to dismiss was what's been pleaded in the complaint. The only fact pleaded in the complaint was that PeopleSoft's percentage of revenue from services had risen to 70% of its revenue. But that doesn't tell you anything, since it could have 100% of its revenue from services and still be a small player in the services market, depending on what the positions of other market participants were. I don't know if that answers your question, Judge Gould. No, I think it does. Thank you. Okay. So the district court acted correctly in dismissing the Sherman Section 2 monopolization claim because it had given Insight three chances to plead facts relating to monopoly power, and it never was able to do that. And the same issue, a failure to plead facts showing that there was a significant risk or a dangerous probability of successful monopolization. There were never any facts pleaded as to that. The district court also pointed out on that issue that there was never any pleading that there were significant barriers to entry into this market. And, in fact, as we pointed out in our brief, the evidence on that, which was set forth in Insight's own investor's memorandum, was that barriers to entry were low. You don't need a big plant. All you need to do is raise some capital and hire people who know how to implement the software. It's easy to get into the market. And there's nothing showing that PeopleSoft, no allegations and no evidence, showing that PeopleSoft had significant power in that market. The same issue, the same problem is presented with the essential facilities or refusal to deal argument, which is raised in Insight's briefs. That's also a monopolization argument because if you're not a monopolist, then you can't have any effect on competition by refusing to deal with someone. So those also failed at the time of the motion to dismiss. Now, Insight never even raised that theory at the motion to dismiss, which is why we argued that it's been waived. They raised it in opposition to summary judgment when there was no more monopolization claim. But even on summary judgment, if it was permissible for them to raise it then, it was proper to find that they had no claim because, once again, they could not show that PeopleSoft had the power to eliminate competition in the implementation services market. And that also was the problem with their tying argument. Well, two problems. First of all, they didn't have any evidence of a tie. They didn't have one customer say, I was forced to use PeopleSoft's services in order to get its software or in order to get upgrades to its software. Nor was there any evidence that there was economic coercion by way of the costs of a bundle. They make a bundle argument, but there's no evidence to meet the standard that it's the plaintiff's burden to show that allocating prices across any bundled services that it falls below an appropriate measure of the defendant's cost. And in a case cited by Insight, Cascade Health versus Peach Health, this court held that it was the plaintiff's burden to make that showing. All right. Now, there's a couple of other things I'm going to skip around here a bit in light of the time that I have. On the disparagement question, the claims failed there because there was no evidence that PeopleSoft disparaged Insight to anybody. The two particular customers involved who were deposed here, and that was IMI and Interstate Battery, both said that PeopleSoft never said anything bad about Insight. So Insight relies entirely on an article that it has downloaded off the Internet from the Computer World website that talks about a reduction in the number of certified partners to 34. And, of course, we've objected to that because it is double hearsay since it's a statement by a reporter out of court quoting, allegedly, somebody from PeopleSoft. But even if you considered that document, there's nothing linking it to Insight because when that reduction was made, Insight remained a certified partner. It remained a certified partner for a full year after that article was issued. There's nothing in the record to suggest that any customer linked the statements in that article to Insight. On the state claims, let me address three things quickly. First, jurisdiction, since Judge Fernandez, you asked that up front. And the answer to that is if you file a timely Rule 59e motion, then the appeal is stayed. It's crystal clear in the appellate rules. Mr. Shigati mentioned the Gould case. I have to apologize because when I wrote our brief, I misread Gould. Although Gould does say that it's the preferred practice after an appeal has been taken to ask the court of appeal, well, I'm sorry, to ask the district judge whether it would like to consider a post-trial motion and then to ask the court of appeal to remand it, there's two things about that comment that that's a preferred rule. One, that wasn't a timely Rule 59e motion where it automatically gave the court time. And two, Gould ultimately held the district court had jurisdiction to hear the motion because it would be a waste of time of the court of appeal or of the Supreme Court for somebody to have to first ask, get a remand, simply go to the district court and the district court will make that decision. So either way, Judge Chesney clearly had jurisdiction to consider the Rule 59e motion, and there's nothing showing she abused her discretion by agreeing to hear the State claims. We've addressed the State claims in our brief, and since I only have a minute, I'm not going to go through them individually. What I would like to address is an argument that Insight raises in its reply brief, and that is, it raises an issue of delayed discovery of its claims in connection with the statute of limitation arguments that Peoplesoft made below. That argument was not pleaded in the complaint, which it should have been under applicable Ninth Circuit law, in other words, plead the facts that show why delayed discovery is appropriate. It wasn't raised in opposition to summary judgment. It wasn't raised in the opening brief in this court. It's been waived. But in any event, whatever this court thinks of that argument, it's not essential to the result on any of the State claims because in each case, as shown in our evidence, that Insight had. Finally, a quick point. Insight argues that it was denied due process because it didn't have a hearing on sanctions. In docket number 282, which unfortunately is not in our excerpts, and I apologize, but if the Court refers to that, because it is in the clerk's record, you'll see that Insight left it to the discretion of the Court, because Insight wasn't able to make the hearing. It left it to the discretion of the Court whether to proceed without a hearing. I would just submit that Insight did not have the evidence on any of its claims, and therefore, the judgment below should be affirmed. Thank you. Thank you, Your Honor. One of the issues about Judge Gould's question is that there is also a component called mid-market for the customers. It is not the overall market, but some of the customers, some of the market participants, like Mr. Hughes mentions, IBM, Pricewaterhouse, Arthur Anderson, which is now Accenture, Capgemini, these are mega companies. They charge upwards of $300 an hour for consulting, and the type of customers that Insight serviced fall into a category called mid-market customers, whose annual revenues would be $50 million to $500 million, which is a separate category of customers that PeopleSoft itself created, and PeopleSoft certified Insight as a mid-market industry services solutions provider. That is at excerpts of the record 120405. How many of the 34 focused on that segment of the market? There is further segmentation, Your Honor. Out of the 34, they have to have subject matter expertise into the vertical. For example, if you are an expert in implementation in the health care area, you will not be considered an expert in wholesale distribution. It is further segmented like that. And if we look at these particular markets, when it came to the two customers at issue, Interstate Batteries and IMI, it is clear that Insight was the only available, other than PeopleSoft itself. Insight was the only available competitor in that particular niche. A lot of people did not specialize in wholesale distribution. Insight did. In order to specialize in it, you have to hire the people who knew the wholesale distribution market, transfer that wholesale distribution supply chain knowledge into the computer field, and you've got to have a computer guy on one side, a wholesale distribution expert on another side. They have to exchange these things and then automate this whole process. So that is missing. And the 34 people that they mentioned do not suffice because, as we can see, the two customers at issue, there were no competition from Capgemini, Price Waterhouse, IBM, or Accenture in those cases. So are you defining the market in terms of customers? We already defined in the complaint as pertaining to the mid-market customer base in the PeopleSoft aftermarket for the manufacturing automation software. We already did that in the complaint itself. Another thing about the market power is one thing is the customer preference and the ability to switch vendors, about which I have briefed in the papers, and the lock-in effect that a customer feels once you have, if you are a $50 million annual revenue company and you put in $4 million of ERP system and paid $1 million or $2 million for a licensing fee and hired these 20, 30 consultants and paid them $100, $200 an hour, you are not going to dump all this thing and then go to another vendor simply because the prices rose. There is abundant evidence of lock-in effect based on admission by Mr. Craig Conway himself in the deposition. One more. Mr. Conway did not, contrary to what my opposing counsel indicated, Mr. Conway's testimony was not that PeopleSoft's market share was 5%. And actually he didn't talk about any percentages because he professed a total ignorance about who had how much market share in what market. And when they were talking about, when PeopleSoft talked about markets, they talked about an ERP as a whole without differentiating into these vertical segments, mid-market or upscale market or a down market, et cetera, et cetera. They did not differentiate between the specializations for health care, education, shoes and apparel and all those different segments into which the specialization happened. Therefore, their market definition is kind of inclusive, is over-inclusive to the point of being not much useful to the court. And they also mentioned that there were no barriers to entry. There is no proof that there is no barriers to entry. As a matter of fact, we have shown proof that 70 percent were summarily discharged. There is nothing more proof to say that you can't do that. I'm showing what someone's counsel, showing a number of suppliers are discharged doesn't really prove there are entry barriers. It doesn't prove that 70 or 170 other companies couldn't enter the market. Well, barrier to entry also includes the barrier to remain in the business. I mean, they can enter, but they could be fired tomorrow. Then there is a barrier to entry. What they are saying is all you've got to do is have a capital. Yes, sir. Now, how do you respond to the argument that was made that you didn't have to be certified to perform the work, that Accenture wasn't a certified supplier, but it had a big share of the implementation service? Mr. Conway himself said the customers look for certification. The two customers at issue here wanted not only certification but also reference customers. You must show that you implemented this thing, you have proven your skills elsewhere, and without a reference customer, for a company in the mid-market especially, Accenture may pull something from somebody, but that is not the industry practice as we have seen from the two customers. They did not go and invite bids from anybody who claims to say that I am a PeopleSoft implementer. They selected the people by looking at the people who are proven to have the industry expertise in that particular niche market, for example, in the retail, in the spare parts area and also in the wholesale distribution area. Otherwise, there would have been 50 bids for IMI or IBSA. They didn't do that. Thank you. Thank you. Thank you. Thank you. Thank you, counsel. Thank you, Your Honor. This matter will stand submitted.
judges: Fernandez, Gould, Sedwick